A04A0936, A04A0937. KROGER COMPANY v. U. S. FOODSERVICE OF ATLANTA, INC.; and vice versa.
(607 SE2d 177)

SMITH, Chief Judge.

U. S. Foodservice of Atlanta, Inc. (FS) filed a verified complaint against the Kroger Company (Kroger) seeking payment of $121,070.69 plus interest due on a commercial account. A jury found that Kroger owed $117,637.46. In entering judgment, the trial court added to the verdict statutory prejudgment interest of $81,169.85 and statutory attorney fees of $29,821.10. Later, the court amended that judgment to remove the interest and attorney fees. In Case No. A04A0936, Kroger appeals the denial of its motion for directed verdict. In Case No. A04A0937, FS cross-appeals the deduction of the interest and attorney fees from the judgment. After review, we conclude that the trial court correctly refused to direct a verdict for Kroger but erred by removing the interest and attorney fees from the judgment.

## Case No. A04A0936

On appeal, the evidence must be construed to uphold the verdict of the jury. *Willis v. Brassell*, 220 Ga. App. 348 (469 SE2d 733) (1996). Every presumption and inference arising from the evidence must be considered in favor of the verdict. *White Stores v. Washington*, 135 Ga. App. 67-68 (217 SE2d 391) (1975). So viewed, the evidence shows that from 1994 until mid-January 1999, Kroger ordered approximately $4.5 million of goods per year on an open account with FS, a wholesaler of food and food service products. After Kroger's last payment, FS audited the account and determined that Kroger still owed $121,070.69. FS sent a final demand letter on November 12, 1999, for payment of $121,070.69, and after Kroger failed to remit that sum, FS filed suit.

At trial, to establish the amount of Kroger's indebtedness, FS introduced documentary evidence and the testimony of Roberta Laccorn and Pamela Moore. Laccorn was FS's credit manager and Moore was its "dedicated bookkeeper," meaning that she had sole responsibility for Kroger's account.

FS distributed products to approximately 150 Kroger stores. Upon receiving an order from a Kroger store, FS would download the order and create an invoice listing the items to be delivered and their

cost. FS would deliver the invoices in conjunction with shipments and a Kroger employee and FS's driver would check the delivery. Undelivered items would be marked as shorts at the point of delivery by the driver or a Kroger employee. The FS driver would then return the invoice and FS would manually correct its database to reflect the "shorts" and damaged or returned items and issue credits to Kroger's account. A customer copy of each invoice, as corrected, served as a delivery receipt and was left at the local store. Each invoice noted when payment was due and authorized the collection of attorney fees in the event of nonpayment. Based on the corrected invoices, Moore made adjustments to the database and the billing system. Each week, Moore sent billing statements to Kroger's corporate office in Nashville, Tennessee. Each weekly statement noted adjustments for credits and was accompanied by the invoices from which the statement was compiled. When Kroger wrote a check to FS, Kroger would include a "tear part" from the statement which identified the invoice numbers included in its payment. Issues of credits, shorts, and payments were resolved on a regular basis by representatives of Kroger and Moore. These accounting procedures remained in place from August 1994 through December 1997.

Problems arose after Kroger notified FS on December 17, 1997, that it would be changing its payment procedure on its deli account effective January 1, 1998. Kroger informed FS that it would no longer be making payments based on FS's statements and invoices because it was converting to a paperless system and would be processing payments to FS "from their local store scanning delivery sheets."

In January 1998, Kroger began remitting payments to FS without identifying any invoice numbers. Without the invoice identification, FS could not determine which particular invoices were being paid by Kroger. FS notified Kroger about the difficulties in posting payments. When FS asked Kroger for back-up documentation for its payments so that FS could properly post and credit its account, Kroger responded by saying that under its new system, "they had nothing to give us," to show what was being paid by each check.

At some point, Kroger instructed FS to stop sending copies of the invoices. As a result, when FS sent the weekly statements for payment to Kroger's corporate office, those statements were no longer accompanied by the underlying invoices. To credit Kroger's payments to its account, FS began posting Kroger's checks to the oldest unpaid invoices.

FS made its final delivery to Kroger on January 18, 1999, and Kroger made its last payment to FS on March 17, 1999. After applying all payments from Kroger, Laccorn and Moore determined that Kroger's account had an unpaid balance of $121,070.69.

To confirm the computation of the deficiency, FS tried without success to obtain Kroger's list of scanned items so that it could compare Kroger's list with its own invoices. Using a check register supplied by Kroger, FS verified that every check received from Kroger had been properly posted and deposited to Kroger's account. After deducting from Kroger's 1998 check register all duplicate check payments and after subtracting payments made by Kroger in 1998 for 1997 deliveries, FS determined that Kroger had paid $4,295,010.77 from January 1, 1998, forward. FS's shipments to Kroger for that same period totaled $4,415,783.28, resulting in a deficiency of $120,772.51. After applying billings due on other Kroger accounts, the net deficiency was $121,069.03.

Expressing confidence that Kroger's total debt was $121,070.69 and not the slightly lesser amount of $121,069.03, Laccorn testified that "we did two check registers and we did check it over twice. I checked once and Pam [Moore] checked. Even at one point in time I had another bookkeeper verify both mine and [Moore's]. It was triple checked." Laccorn testified that she believed that the computer calculation of $121,070.69 was more accurate than her manual total of $121,069.03.

Moore testified without contradiction that even after Kroger had changed its system, she had continued to use the invoices to adjust Kroger's account and issue credits. Moore testified that the invoices "were coming back with our drivers each day," and that that part of the process "never changed." She added, "[the invoices] would still come in to me and I would issue the credit, if they had a credit to be issued." Moore also testified that she continued sending statements to Kroger until the account was closed.

In addition, FS introduced documentary evidence, without objection, providing details of the invoices for sales made to Kroger between January 1, 1998, and the date the account was closed. A detailed register of invoices showed that the net total of deliveries less credits was $4,415,783.28. FS also introduced in evidence, without objection by Kroger, itemized statements of Kroger's account detailing the unpaid invoices and the delivery locations. These statements supplied support for the total of the balance that FS claimed was overdue. The authenticated statements were admitted in evidence as business records.

1. Kroger contends that the trial court should have directed a verdict against FS on the issue of damages because FS failed to prove its damages with the requisite specificity. Kroger complains that the jury's verdict was premised on conjecture and speculation. Kroger asserts that through its cross-examination of Laccorn and Moore, it

elicited testimony showing discrepancies between the account statements and the individual invoices, thereby creating uncertainty as to what amount, if any, was due.

"A directed verdict is authorized only when there is no conflict in the evidence on any material issue and the evidence introduced, with all reasonable deductions, demands a particular verdict." (Citation and footnote omitted.) *H. J. Russell & Co. v. Jones*, 250 Ga. App. 28-29 (550 SE2d 450) (2001). Here, the evidence with all reasonable deductions did not demand a particular verdict.

It is axiomatic that damages cannot be left to speculation, conjecture, or guesswork and must be proven with reasonable certainty. See *Post Realty Assoc. v. DSL Assoc.*, 228 Ga. App. 678 (492 SE2d 600) (1997). To recover on its claim, FS had to prove that Kroger was indebted to FS "in a definite and correct amount." *White Stores*, supra, 135 Ga. App. at 67. The discrepancies at issue derive primarily from purported "shorts," items ordered but not delivered for which Kroger now claims it should have received credit on its account. While Laccorn did concede that some credits on a few invoices did not seem to appear on the corresponding statements, the issue of credits on the account was primarily addressed by Moore, who had sole responsibility for crediting the account when appropriate.

Moore testified that she was certain that all credits to which Kroger was entitled had been applied to the account and that there were no errors in issuing such credits. Moore was confident that she had properly credited Kroger's account for all shorts, returns, or damaged products. See *Professional Ins. Svcs. v. Sizemore Elec. Co.*, 188 Ga. App. 463 (373 SE2d 276) (1988). Moore explained that certain credits due on an invoice might not have appeared promptly on a statement because she had created a dummy account on which to apply credits and post payments after Kroger had changed its payment procedures.

Any purported discrepancy between the amounts credited to Kroger and an amount not properly credited to Kroger's account simply created an issue of fact for jury resolution. See id. at 463 (1). Whether Kroger shed doubt on the accuracy of FS's calculation of its indebtedness remained a question of fact for the jury not a question of law. See id. Any issue as to witness credibility or the weight of the evidence remained solely within the province of the jury. *Stubbs v. Harmon*, 226 Ga. App. 631, 632 (1) (487 SE2d 91) (1997). Contrary to Kroger's argument, the record contains evidence from which a jury could find that Kroger owed FS the specific amount of $117,637.46, a fixed and certain sum. See *White Stores*, supra, 135 Ga. App. at 67-68. The statements of account were identified and authenticated by the person who prepared and maintained them. "Once admitted, they established a prima facie case for [the plaintiff] by proving the fact of

the account and the amount owing." *Andrews v. Adams Drive, Ltd.*, 142 Ga. App. 32, 33 (4) (234 SE2d 835) (1977).

After FS established its right to recover on the account, Kroger was required "to come forward with any defense [it] wished to assert." *Andrews*, supra, 142 Ga. App. at 33-34. Kroger's controller in the Atlanta division, Karen Shanks, expressed her opinion that Kroger paid "for everything we were invoiced" and also testified, "I don't believe we've overpaid." Her opinion testimony however was not supported by documentary evidence. See id. Because a particular verdict was not demanded, the trial court did not err in denying Kroger's motion. See *St. Paul Mercury Ins. Co. v. Meeks*, 270 Ga. 136, 137 (1) (508 SE2d 646) (1998).

2. Kroger contends that the trial court erred in denying its motion for directed verdict because FS failed to prove the delivery of the goods at issue. Kroger claims that because FS did not introduce copies of all invoices and because some invoices were not initialed or signed by Kroger, FS did not prove delivery of the items on those invoices.

Proof of delivery of goods is an essential element that a creditor must establish to recover on an account. *Mountain Bound, Inc. v. Alliant FoodService*, 242 Ga. App. 557, 559 (3) (530 SE2d 272) (2000). Even so, a creditor is not required to produce actual invoices to meet its burden of proof. See *Professional Ins. Svcs.*, supra, 188 Ga. App. at 464 (1); *Andrews*, supra, 142 Ga. App. at 33 (4). At trial, FS submitted copies of numerous invoices issued to Kroger. The invoices designated the specific Kroger location of delivery, described the items delivered, and listed the quantity and cost of each item. An accounting of all payments made by Kroger to FS was also entered in evidence along with a summary of that accounting.

After FS set forth a prima facie case of Kroger's indebtedness and the delivery of the goods, Kroger had to present evidence to refute FS's proof. See *Andrews*, supra, 142 Ga. App. at 33-34. Shanks, Kroger's primary witness, conceded that, during her review of Kroger's records, she did not find any document that disputed the delivery of items for which Kroger was billed. Shanks also admitted that she did not discover any evidence indicating that Kroger had notified FS that it had been billed for an item not received. Shanks acknowledged that Kroger's accounting system was unable to match FS's specific invoice numbers with Kroger's checks to FS. Shanks also testified that when FS asked Kroger to provide a list of the items scanned, Kroger had responded that it was "unable to provide that data" because "it would have been very difficult," for Kroger "to pull all that paperwork" from every store.

The record contains hundreds of invoices issued by FS to Kroger on which collectively thousands of individual items separately appear, quite literally everything from soup to nuts. While it is true that on a few isolated invoices some items appear to have been marked as "short" or not delivered, Kroger did not offer the testimony of a single employee who purportedly had so marked an invoice. Nor did Kroger offer any documentary evidence to refute Moore's testimony that she had given Kroger all credits to which it was entitled. The court did not err in refusing to direct a verdict on that basis. See *Andrews*, supra, 142 Ga. App. at 33-34.

### *Case No. A04A0937*

3. FS contends that the trial court committed legal error by removing its prior award of attorney fees obtained pursuant to OCGA § 13-1-11. FS asserts that because it clearly satisfied the statutory requirements for obtaining attorney fees, the calculation of attorney fees did not require a hearing. We agree.

Subsection (a) of OCGA § 13-1-11 states in part: "Obligations to pay attorney[ ] fees upon any note or other evidence of indebtedness, in addition to the rate of interest specified therein, shall be valid and enforceable and collectible as a part of such debt if such note or other evidence of indebtedness is collected by or through an attorney after maturity. . . ." The recovery of attorney fees under OCGA § 13-1-11 is enforceable when (1) the evidence of indebtedness provides for attorney fees and (2) sets the amount of those fees "in some specific percent of the principal and interest owing thereon . . . not in excess of 15 percent of the principal and interest owing on [the] other evidence of indebtedness." OCGA § 13-1-11 (a) (1).

Once these preconditions are established, a contractual provision to pay attorney fees in connection with a creditor's efforts to collect "shall be valid and enforceable." OCGA § 13-1-11 (a). A creditor who fully satisfies the requirements of OCGA § 13-1-11 is entitled to receive statutory attorney fees. *TermNet Merchant Svcs. v. Phillips*, 277 Ga. 342 (588 SE2d 745) (2003). When the statutory requisites are met, the trial court's discretion to deny the award is eliminated. Id. In *TermNet*, the Georgia Supreme Court analyzed the provisions of OCGA § 13-1-11 and decided that

> where a party complies with the requirements of OCGA § 13-1-11, the party is entitled to receive statutory attorney fees. Because the language of the statute is mandatory rather than permissive, we further hold that the trial court is without discretion to deny fees under section 13-1-11 when all the conditions of that statute are unquestionably satisfied.

(Citation and footnote omitted.) Id. at 344-345 (1).

Turning to the facts in this case, it is clear that FS satisfied all of the requirements of OCGA § 13-1-11. The invoices issued to Kroger plainly informed Kroger that if Kroger's failure to pay the invoices resulted in collection through an attorney, FS would seek attorney fees. By a certified letter of November 12, 1999, FS notified Kroger that if it did not pay $121,070.69 within 14 days, FS would refer the matter to "our attorneys for collection." Thereafter, an attorney filed suit on behalf of FS to collect the debt.

In addition, the consolidated pretrial order reiterated FS's claim to the recovery of statutory attorney fees. Under the section for "types of damages and the applicable measure of those damages," the consolidated pretrial order listed attorney fees "pursuant to OCGA § 13-1-11 in the amount of 15% of the principal and interest due, ten (10) days after demand." Under the section for "[s]pecial authorities relied upon by Plaintiff relating to peculiar evidentiary or other legal questions," the consolidated pretrial order included OCGA § 13-1-11. Based upon these facts, it follows that FS was entitled to recover its statutory attorney fees from Kroger. See *TermNet*, supra, 277 Ga. at 344-345; see also *Mercantile Nat. Bank v. Berger*, 129 Ga. App. 707, 709 (5) (200 SE2d 921) (1973) (jury issue lacking where note provided for attorney fees of 15 percent). Because the amount to be awarded was subject to simple computation by application of the unambiguous rate of 15 percent, a hearing was not required "merely to effect this computation." *Woods v. Gen. Elec. Credit Auto Lease*, 187 Ga. App. 57, 61 (2) (369 SE2d 334) (1988). Therefore, the trial court erred by denying FS's request for attorney fees under OCGA § 13-1-11 as calculated on the verdict of $117,637.46 plus interest.

4. FS contends that the trial court erred by removing its prior award of prejudgment interest obtained pursuant to OCGA § 7-4-16. FS claims that the amount of Kroger's indebtedness constituted liquidated damages due on an open commercial account and that it was entitled to prejudgment interest on that debt.

OCGA § 7-4-16 defines a commercial account as "an obligation for the payment of money arising out of a transaction to sell or furnish . . . goods or services. . . ." A commercial account is by definition a liquidated claim, meaning that it is still running or open to future adjustment or liquidation until such account has been finally settled or closed. See *Gage v. Tiffin Motor Homes*, 153 Ga. App. 704, 706 (266 SE2d 345) (1980). By law, unless otherwise agreed in writing, the owner of a commercial account "may charge interest on that portion of a commercial account which has been due and payable for 30 days or more at a rate not in excess of 1 1/2 percent per month calculated on the amount owed from the date upon which it became due and

payable until paid." OCGA § 7-4-16. As a general rule, "[p]rejudgment interest is allowable only where the amount recovered is liquidated, i.e., certain and fixed, 'a sum which cannot be changed by the proof.' " (Citations and punctuation omitted.) *Dalcor Mgmt. v. Sewer Rooter*, 205 Ga. App. 681, 682-683 (4) (423 SE2d 419) (1992).

FS presented evidence that Kroger owed the specific debt of $121,070.69 and failed to pay that sum after FS's demand. See *Trebor Corp. v. Nutmeg Indus.*, 208 Ga. App. 697, 698 (1) (431 SE2d 402) (1993) (unpaid invoices were a liquidated debt on a commercial account subject to prejudgment interest). The fact that the jury did not award the entire amount of FS's claim did not make the damages unliquidated. See *Carlos v. Murphy Warehouse Co.*, 166 Ga. App. 406, 408 (2) (304 SE2d 439) (1983). We therefore hold that the amount of the unpaid balance as determined by the jury was "a due and payable liquidated debt on a commercial account, subject to prejudgment interest under OCGA § 7-4-16." (Citation omitted.) *Dalcor Mgmt.*, supra, 205 Ga. App. at 683.

Also, when the parties have stipulated that the trial court would decide and determine the question of interest due on a commercial account, it is not error for the court to do so. *Gold Kist Peanuts v. Alberson*, 178 Ga. App. 253, 255 (2) (342 SE2d 694) (1986). Here, the parties' consolidated pretrial order plainly indicated that FS was seeking statutory interest. Under "types of damages," the consolidated pretrial order specified prejudgment interest "pursuant to OCGA § 7-4-16 at the rate of 1.5% per month from November 12, 1999." Under special authorities relied upon by FS, the pretrial order cited OCGA § 7-4-16. See id.

Kroger's reliance upon *Aston Mills, Inc. v. Suntek Indus.*, 190 Ga. App. 217 (378 SE2d 399) (1989), is misplaced because that case is legally and factually distinguishable. In *Aston Mills*, the pretrial order made no mention of statutory interest and did not reserve that issue for the trial court. Id. at 218. Here, however, the consolidated pretrial order clearly specified that FS sought prejudgment interest pursuant to OCGA § 7-4-16.

After the verdict, FS's counsel submitted computations to the trial court that calculated statutory interest and statutory attorney fees. "[E]ven in the absence of such a compilation, the trial court by dint of simple mathematical calculation could compute the amount of such interest . . . on the debt determined due." *Rothstein v. Mirvis & Fox, Inc.*, 155 Ga. App. 79, 81 (3) (270 SE2d 301) (1980). No error has been shown in either calculation. We therefore direct the trial court, on remand, to enter judgment that includes prejudgment interest and attorney fees.

*Judgment affirmed in Case No. A04A0936. Judgment reversed and remanded with direction in Case No. A04A0937. Johnson, P. J., and Phipps, J., concur.*

DECIDED NOVEMBER 19, 2004.

*Smith, Gambrell & Russell, David C. Newman, Edward D. Burch, Jr.*, for appellant.
*J. Christopher Simpson*, for appellee.